1  JOICE B. BASS (Nevada Bar. No. 9405)
   DANIEL IVIE (Nevada Bar No. 10090)
2  LEWIS AND ROCA LLP
   3993 Howard Hughes Pkwy., Suite 600
3  Las Vegas, NV 89169
   Telephone: (702) 385-3373
4  Facsimile: (702) 385-9447
   jbass@lrlaw.com
5
   SEAN T. PROSSER (admitted *pro hac vice*)
6  RANDALL FONS (admitted *pro hac vice*)
   TYSON E. MARSHALL (admitted *pro hac vice*)
7  MORRISON & FOERSTER LLP
   12531 High Bluff Drive, Suite 100
8  San Diego, CA 92130-2040
   Telephone: (858) 720-5100
9  Facsimile: (858) 720-5125
   sprosser@mofo.com
10

11 Attorneys for Defendant R. Brooke Dunn

12                **UNITED STATES DISTRICT COURT**

13                     **DISTRICT OF NEVADA**

14 SECURITIES AND EXCHANGE COMMISSION,      ) Case No. 2:09-cv-02213-JCM-VCF

15             Plaintiff,                   )
                                            )
16       v.                                 )
                                            )
17 R. BROOKE DUNN and NICHOLAS P. HOWEY     )
                                            )
18             Defendants.                  )
                                            )
19 _____  )

20   **DEFENDANT R. BROOKE DUNN'S MOTIONS IN LIMINE NOS. 1-6 TO EXCLUDE**
                    **EVIDENCE AND/OR ARGUMENT**
21                  ***(Oral Argument Requested)***

22

23

24

25

26

27

28

   sd-562790

# TABLE OF CONTENTS

**Page**

I.     RELEVANT BACKGROUND .......................................................................... 1

II.    MOTION IN LIMINE NO. 1:  TO EXCLUDE ANY EVIDENCE OR
       INFERENCE OF PURPORTED DISCLOSURE OF MATERIAL NONPUBLIC
       INFORMATION BY DUNN BEFORE FEBRUARY 26, 2007 ....................................... 1

III.   MOTION IN LIMINE NO. 2:  TO EXCLUDE MR. MAYER'S PURPORTED
       EXPERT OPINION REGARDING "IMPLAUSIBILITY" OF HOWEY'S
       TRADING RATIONALES ................................................................................... 4

       A.     The Court Should Exclude Mr. Mayer's Purported Expert Opinion And
              Testimony Regarding Howey's Reasons For Selling Shuffle Master Stock
              And Call Options ..................................................................................... 4

       B.     The Court Should Exclude Mr. Mayer's Purported Expert Opinion And
              Testimony Regarding Howey's Reasons For Buying Shuffle Master Put
              Options ................................................................................................... 7

IV.    MOTION IN LIMINE NO. 3:  TO EXCLUDE MR. MAYER'S PURPORTED
       EXPERT OPINION REGARDING HOWEY'S TRADING STRATEGY AND
       EXPERIENCE ................................................................................................ 9

V.     MOTION IN LIMINE NO. 4:  TO EXCLUDE MR. MAYER'S PURPORTED
       EXPERT OPINION ON ULTIMATE QUESTION OF LAW ........................................... 9

VI.    MOTION IN LIMINE NO. 5:  TO EXCLUDE EVIDENCE OR ARGUMENT
       CONCERNING DUNN'S AND HOWEY'S TELEPHONE CALL SEVEN
       MONTHS AFTER THE TRADING ISSUE ........................................................... 10

VII.   MOTION IN LIMINE NO. 6:  TO EXCLUDE EVIDENCE OR ARGUMENT
       CONCERNING PRETRIAL MOTIONS ............................................................... 11

VIII.  CONCLUSION ............................................................................................ 12

1

## **TABLE OF AUTHORITIES**

2

Page(s)

3

**CASES**

4

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
   966 F.2d 443 (9th Cir. 1992)......................................................................................... 10

*CDA of Am. Inc. v. Midland Life Ins. Co.,*
   No. 01-CV-836, 2006 U.S. Dist. LEXIS 97327 (S.D. Ohio Mar. 27, 2006) ........................ 11

*Clark v. Takata Corp.,*
   192 F.3d 750 (7th Cir. 1999)........................................................................................... 7

*Clipco, Ltd. v. Ignite Design, LLC,*
   No. 04-C 5043, 2005 U.S. Dist. LEXIS 26044 (N.D. Ill. Oct. 28, 2005) ............................ 11

*General Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ........................................................................................................ 7

*In re Applied Signal Tech. Sec. Litig. Inc.,*
   No. C-05-1027-SBA, 2006 WL 1050174 (N.D. Cal. Feb. 8, 2006) ..................................... 6

*In re Avista Corp. Sec. Litig.*
   415 F. Supp. 2d 1214 (E.D. Wash. 2005) ......................................................................... 6

*In re Stratosphere Corp. Sec. Litig.,*
   66 F. Supp. 2d 1182 (D. Nev. 1999) ................................................................................. 7

*Nationwide Transp. Fin. v. Cass Info. Sys.,*
   523 F.3d 1051 (9th Cir. 2008).......................................................................................... 9

*Plevy v. Haggerty,*
   38 F. Supp. 2d 816 (C.D. Cal. 1998) ................................................................................ 6

*Poison v. Cottrell, Inc.,*
   No. 04-cv-882-DRH, 2007 WL 2409838 (S.D. Ill. Aug. 23, 2007) .................................... 11

*SEC v. Leslie,*
   No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010) ................................... 4, 6, 10

*SEC v. Lispon,*
   46 F. Supp. 2d 758 (N.D. Ill. 1998) ................................................................................. 6

*SEC v. Retail Pro, Inc.,*
   No. 08cv1620-WQH-RBB, 2011 WL 589828 (S.D. Cal. Feb. 10, 2011) ........................... 11

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*U.S. v. Gonzalez-Maldonado*,
    115 F.3d 9 (1st Cir. 1997) ........................................................................................... 10

*Walton v. Bridgestone/Firestone, Inc.*,
    No. cv-05-3027-PHX-ROS, 2009 U.S. Dist. LEXIS 85014 (D. Ariz. Jan. 16, 2009) ............ 11


STATUTES

Fed. R. Evid. 401 ....................................................................................................... 10, 11

Fed. R. Evid. 402 ............................................................................................................... 3

Fed. R. Evid. 403 .......................................................................................................... 3, 10

Fed. R. Evid. 404 ............................................................................................................... 4

Fed. R. Evid. 702 ......................................................................................................... 4, 6, 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

sd-562790

Defendant R. Brooke Dunn ("Dunn") moves *in limine* for an Order barring Plaintiff U.S. Securities and Exchange Commission ("SEC") from introducing evidence, testimony, and/or argument at trial regarding the matters set forth herein.

## I.   RELEVANT BACKGROUND

On January 16, 2007, Defendant Nicholas P. Howey ("Howey") and Dunn met for dinner in Las Vegas. (SEC's Complaint ("Compl.") ¶ 10.) At dinner, Howey and Dunn discussed a number of topics, including Dunn's employer Shuffle Master, Inc. ("Shuffle Master"). (*Id.*) The SEC agrees that Dunn did not disclose any material nonpublic information concerning Shuffle Master to Howey during this dinner (SEC's Mot. in Limine to Exclude Expert Testimony ("SEC MIL"), filed June 2, 2011, at 8-10) and <u>the Court has found that "the SEC does not allege that Dunn made . . . material disclosures to Howey"</u> at this time (*See* Court's June 30, 2011 Order on Mot. for Summ. J. and SEC's Mot. in Limine ("Order") at 5). In the days and weeks following that meeting, Howey purchased Shuffle Master stock and call options. (Compl. ¶¶ 11-14.)

On February 26, 2007, Dunn telephoned Howey and the two spoke for 90 seconds. (*Id.* ¶ 16.) The parties agree that during that telephone call Howey and Dunn discussed Broadway show tickets. *See* Court's August 17, 2011 Pretrial Order at 6 (Admission No. 12). Later that day, Howey sold his Shuffle Master stock and call options and replaced them with Shuffle Master put options. (Compl. ¶¶ 18-19.) On February 27, 2007, Shuffle Master issued a press release announcing lower-than-expected preliminary financial results for its quarter ended January 31, 2007. (*Id.* ¶ 20.) Because of the timing of Howey's trading, the SEC alleges that during their telephone call on February 26, in addition to discussing show tickets, Dunn must have tipped Howey about Shuffle Master's pending press release. (*Id.* ¶ 16.) Both Dunn and Howey deny that allegation. Trial is set for April 23, 2012.

## II.   MOTION IN LIMINE NO. 1: TO EXCLUDE ANY EVIDENCE OR INFERENCE OF PURPORTED DISCLOSURE OF MATERIAL NONPUBLIC INFORMATION BY DUNN BEFORE FEBRUARY 26, 2007

In its Complaint, the SEC originally alleged that Dunn improperly provided Howey with nonpublic information concerning Shuffle Master on two separate occasions. According to the SEC, one alleged "tip" occurred at dinner on January 16, 2007 regarding "Project Blue Sky," a

1

2   potential joint venture between Shuffle Master and International Game Technology, Inc. ("IGT").

3   (*See* Compl. ¶¶ 9-12.)  The second alleged tip occurred during Dunn's and Howey's February 26,

4   2007 telephone call.  During discovery and briefing on the parties' cross-motions for summary

5   judgment, it became clear that there was no basis for the SEC's allegation of a tip regarding

6   Project Blue Sky during the January 16 meeting or otherwise.  As a result, the SEC recanted its

7   allegations that Dunn and Howey discussed Project Blue Sky, and this Court already has found

8   that the SEC does not now allege any purported tip regarding Project Blue Sky on January 16,

9   2007.  *See* Order at 5.  Thus, based on this Court's prior Order and the SEC's abandonment of

10  allegations regarding Project Blue Sky, the Court should exclude from trial any evidence or

11  inference of any communication or tip between Dunn and Howey regarding Project Blue Sky.

12          Specifically, the SEC's Complaint alleges that, during dinner on January 16, 2007, Dunn

13  tipped Howey about "Project Blue Sky."  (Compl. ¶¶ 9-11.)  In fact, the SEC alleges in its

14  Complaint that Howey wrote in his trading journal following that meeting with Dunn, "Stocking

15  up on SHFL pending their IGT announcement (Vegas tip)," noting that the entry was only

16  "approximately two weeks before Shuffle Master and IGT signed the non-binding Project Blue

17  Sky term sheet."  (*Id.* ¶ 11.)  Under the Complaint's heading "Dunn Provides Information to

18  Howey That Causes Howey to Purchase Shuffle Master Stock and Calls," the only information

19  Dunn is alleged to have provided to Howey concerns the nonpublic Project Blue Sky and that

20  Dunn thought the price of Shuffle Master stock would increase.  (*Id.* ¶¶ 9-14.)  Further, the

21  Complaint alleges, or at least attempts to create the inference, that the reason Dunn disclosed

22  material nonpublic information to Howey on February 26, 2007 was to make up for the purported

23  Project Blue Sky tip in January, which did not pan out.  (*See, e.g., id.* ¶ 24.)  Accordingly, it is not

24  surprising that the SEC states in response to interrogatories propounded by Dunn that "Dunn

25  appears to have discussed a possible joint venture with IGT, which shows a lack of appreciation

26  on Dunn's part for keeping confidential inside company information."  (*See* concurrently-filed

27  Declaration of Tyson E. Marshall ("Marshall Decl.") ¶ 2, Ex. 1 (Resp. to Interrog. No. 16).)

28          Faced with unrefuted facts presented by Dunn during discovery and briefing on the

    parties' cross-motions for summary judgment, the SEC has recanted its allegations in the

1

2   Complaint and its interrogatory responses, claiming that it never alleged that Dunn provided

3   Howey with any material nonpublic information concerning Shuffle Master on January 16, 2007.

4   (SEC MIL at 8-10.)  Moreover, the SEC no longer claims that any of Howey's trading prior to

5   February 26, 2007 was based on a discussion of Blue Sky or any other nonpublic information.

6   (*See id.* at 9-10 ("The SEC alleges <u>one</u> incident of inside tipping in this case"); *see also id.* at 10

7   ("the SEC does not allege that Howey's trading activity prior to February 26, 2007, was

8   improper").)  Faced with the SEC's recent representations (and new admissions) limiting its own

9   allegations, this Court held that certain opinions expressed by Dunn's retained expert challenging

10  the notion that Dunn tipped Howey concerning Project Blue Sky are not relevant to this litigation

11  because the SEC does not allege that Dunn made any material nonpublic disclosures to Howey

12  before February 26, 2007.  *See* Order at 5.

13          Given the SEC's concession that it does not allege or infer that Dunn tipped Howey about

14  any nonpublic information concerning Project Blue Sky specifically or Shuffle Master generally,

15  and the Court's Order, Dunn hereby moves the Court to preclude the SEC from introducing any

16  evidence or from making any inferences, references, speculation, or intimation at trial that Dunn

17  provided Howey with any nonpublic information concerning Shuffle Master at anytime other than

18  on February 26.  The Court already has determined that such evidence or argument is not

19  relevant, and already has excluded testimony from Dunn's expert rebutting any such an argument

20  or evidence.  *Id.*; *see also* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible").

21  Dunn would be prejudiced if the SEC were allowed to renew its past intimations and assertions of

22  a second, earlier tip at trial.

23          Moreover, allowing the SEC to argue that Dunn somehow was motivated to tip Howey on

24  February 26, 2007 because of an earlier conversation regarding nonpublic information also is

25  prejudicial to Dunn.  Fed. R. Evid. 403 (exclusion of evidence proper where "probative value is

26  substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

27  the jury").[1]  Finally, any attempt to paint Dunn as a serial tipper is improper and inadmissible.

28  ---

    [1] In its Motion in Limine, the SEC argued that allowing Dunn's expert to opine that the
    evidence does not support an allegation of an improper tip before February 26, 2007, would be

    (Footnote continues on next page.)

1

2    *See* Fed. R. Evid. 404 (exclusion of character evidence for purpose of inferring conformity).  The

3 SEC maintains that this case is about only one alleged tip on February 26, 2007.  The SEC should

4 not be allowed to attempt to bolster its circumstantial claim that Dunn is liable for tipping Howey

5 on February 26 based on any evidence, inference, or intimation at trial that Dunn tipped Howey

6 with nonpublic information about Shuffle Master at any time before that.

7 **III.   MOTION IN LIMINE NO. 2:  TO EXCLUDE MR. MAYER'S PURPORTED**
         **EXPERT OPINION REGARDING "IMPLAUSIBILITY" OF HOWEY'S**

8          **TRADING RATIONALES**

9    The SEC has submitted an expert report from Michael G. Mayer ("Mayer") (the "Mayer

10 Report").  (Marshall Decl. ¶ 3, Ex. 2 (Mayer Report).)  In Opinion 5.2 of that Report, Mayer

11 opines that Howey's SEC investigative testimony transcript "provides no plausible rationale" for

12 Howey's sale of his Shuffle Master stock and call options on February 26, 2007, or for Howey's

13 purchase of Shuffle Master put options later that same day.  (*See id.* at 12-17.)  Dunn moves to

14 exclude Opinion 5.2.[2]

15      **A.   The Court Should Exclude Mr. Mayer's Purported Expert Opinion And**
          **Testimony Regarding Howey's Reasons For Selling Shuffle Master Stock And**

16           **Call Options**

17    Howey explained in detail during investigative testimony why he sold his Shuffle Master

18 stock and call options on February 26, 2007.[3]  For example, when asked by the SEC why he sold

19 his call options on February 26, Howey testified:

20 (Footnote continued from previous page.)

21 both "highly prejudicial" and "confusing" because the SEC never alleged such a tip.  (SEC MIL
at 8.)  Thus, the SEC should have no basis on which to oppose Dunn's Motion in Limine No. 1.

22    [2] "Before allowing an expert to testify, the Court has a responsibility to determine whether

23 the expert's opinion rests on a reliable foundation and is relevant to the issue before the Court."
*SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *6 (N.D. Cal. July 29, 2010).  "If scientific,

24 technical, or other specialized knowledge will assist the trier of fact to understand the evidence or
to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

25 training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the
testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

26 principles and methods, and (3) the witness has applied the principles and methods reliably to the
facts of the case."  *Id.* at *7; *accord* Fed. R. Evid. 702.

27    [3] On May 23, 2008, before filing its Complaint, the SEC took sworn testimony from Howey

28 as part of its investigation underlying the matter.  Excerpts of Howey's testimony transcript ("Howey
Test.") are attached to the Marshall Declaration as Exhibit 3.  (*See* Marshall Decl. ¶ 4, Ex 3.)

> [Shuffle Master stock] drifted down for six solid weeks with I don't recall a single ray of hope and I do know that on a Wednesday the 21st, hmm, I believe that I — if I were speaking Blackjack I would double down — I decided that I would take another last hurrah and put forth, I believe I bought 50 contracts of the calls on the 21st and — yeah. And . . . [t]hen between the 21st and the 26th I watched that position deteriorate by 50 percent in record time and I [thought] I bought it at $1.85 or $1.35 and it ended up at 75 cents. And puts were higher priced than calls and puts were being bought — a lot more puts were being bought than calls and I decided enough was enough and I got out.

(Howey Test. at 86:13-87:3.)  In addition to selling his calls on February 26 because of significant losses, Howey testified that he sold his stock for virtually the same reason, and also that he "kept pretty close tabs on this stock" and had been monitoring it for six weeks and that he sold his stock on February 26 because of "[t]otal and utter defeat over six weeks." (*Id.* 87:4-88:25.)

Howey reiterated his reasons for selling Shuffle Master stock and call options when the SEC asked "[w]hy did you sell them on the 26th?  Why that day as opposed to another day?" (*Id.* 118:9-10.)  Confirming his earlier testimony that he "had seen the price of [his] calls decline fairly sharply" over six weeks generally, and over the prior four days specifically, Howey added:

> I — I don't know.  I can tell you that the previous four days were particularly brutal so there has to be some day you decide to sell and that was the day I sold . . . [T]hat we were down but I don't recall whether it was $1.85 or a $1.35 and now it was at 75 and that was just brutal.

(*Id.* 117:24-118:21.)  Howey also testified that even before the telephone call with Dunn on the morning of February 26, he "had made up [his] mind to get out, if anything . . . that call [on February 26] made [him] move an hour earlier than [he] would have anyway, just because [Dunn] called." (*Id.* 159:9-15.)  Howey then repeated his earlier testimony that "[to sell on February 26] was a four day decision that had been six weeks in the making." (*Id.* 159:16-24.)

In Opinion 5.2, Mayer confirms Howey's observation of Shuffle Master's historical market decline, noting that Shuffle Master's stock price dropped 5% in the four days leading up to the time Howey sold his stock and options and that Shuffle Master call option pricing declined by more than 50% in that same time period. (Marshall Decl. ¶ 3, Ex. 2 at 13-14.)  Mayer then goes on to opine that Howey's stated reasons for selling on February 26 are "implausible" because *if* Howey had done more "homework" then he *would have learned* that it was not unusual

1

2   for the price of Shuffle Master call options to decline following a decline in Shuffle Master's

3   stock price. (*Id.* at 13-15.) Therefore, Mayer concludes in his report, that it is implausible that

4   the decline in value of Shuffle Master stock and call options observed by Howey in February

5   2007 "was surprising enough for him to" reverse positions. (*Id.* at 15.)[4]

6          As an initial matter, expert testimony is not necessary or helpful to present Shuffle

7   Master's historical stock and option prices at trial. The Court may take judicial notice of public

8   market prices, data, and trends. *See, e.g., In re Avista Corp. Sec. Litig.* 415 F. Supp. 2d 1214,

9   1217–18 (E.D. Wash. 2005) ("judicial notice of well-publicized stock prices and general market

10  trends is permissible"); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998) (stock prices

11  proper subject matter of judicial notice); *In re Applied Signal Tech. Sec. Litig. Inc.*, No. C-05-

12  1027-SBA, 2006 WL 1050174, at *12 (N.D. Cal. Feb. 8, 2006) ("[courts] may also take judicial

13  notice of well-publicized stock prices").

14         More importantly, Mayer's opinion on what might have been "surprising enough" *to*

15  *Howey* to cause him to sell his Shuffle Master stock and call options on February 26, 2007 will

16  not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.

17  Evid. 702. Mayer is not qualified to opine as to what may have been "surprising enough" to

18  Howey to cause him to sell his Shuffle Master stock and call options. He has no "knowledge

19  skill, expertise, experience, training, or education" sufficient to opine as to Howey's thought

20  process. Fed. R. Evid. 702. Even if he did, expert "opinion with respect to the subjective

21  intentions of the parties is inappropriate." *Leslie*, 2010 WL 2991038, at *8; *see also SEC v.*

22  *Lispon*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) (expert opinion regarding subjective belief "falls

23  far short of meeting the reliability and helpfulness criteria set forth in Rule 702" and "years of

24  _____

25         [4] It is important to note that Howey never claimed to be "surprised" that the price of
    Shuffle Master securities fell during that time period. Rather, he claimed that his decision to sell
26  was based on the decline of the price of those securities. Thus, although purporting to address
    Howey's rationale for trading, Mayer addresses a "rationale" which has never been put forth by
27  Howey. Moreover, in his deposition Mayer states that he has no view or opinion on whether
    Howey's trading was "rational." (*See* Marshall Decl. ¶ 5, Ex. 4 (Mayer Deposition Transcript) at
28  55:25-58:6.) In fact, Mayer testified that if he owned a stock that was trending downward and he
    thought the stock would continue in that direction, he too would sell the stock. (*Id.*)

1

2    training and experience . . . do not specially equip [an expert] to divine what Defendant truly

3    believed," noting such opinions "are, at worst, rank speculation; at best, they are credibility

4    choices that are within the province of the jury").

5            Moreover, Mayer's opinion is not based on fact (*i.e.*, what Howey knew about Shuffle

6    Master's stock and option cycle trends), but rather on what Mayer speculates Howey potentially

7    could have discovered if Howey had conducted deeper research into Shuffle Master's historical

8    trading prices. "[E]xpert opinion must be supported by an adequate basis in relevant facts or

9    data." *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1188 (D. Nev. 1999).

10   "[N]othing neither in *Daubert* or the Federal Rules of Evidence requires a district court to admit

11   opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."

12   *General Elec. Co. v. Joiner,* 522 U.S. 136 (1997).

13           Even still, Mayer presents no reliable basis for his opinion that had Howey thoroughly

14   researched the connection between Shuffle Master's historical stock and call option prices Howey

15   would not have decided to sell his stock and call options when he did.  All Mayer presents as

16   Opinion 5.2 is his own unfounded conclusion that Howey would not have been "surprised" by the

17   decline in Shuffle Master securities and therefore might not have sold based on that decline —

18   Mayer does not apply any method or principle, much less a "reliable" one, to reach that opinion.

19   *Id.; see also Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) ("An expert must

20   substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless").

21           Finally, Mayer's opinion does not make any sense — Mayer opines that Howey's

22   subjective thoughts were implausible because of information that *Howey did not have*.  Under

23   Mayer's line of reasoning, and by way of simple analogy, Mayer would find it "implausible" that

24   a car's gas light might prompt a driver to fill up the tank if, unbeknownst to the driver, the gas

25   light was faulty.  Such opinion is not helpful.  Such opinion is not admissible.

26   **B.    The Court Should Exclude Mr. Mayer's Purported Expert Opinion And
         Testimony Regarding Howey's Reasons For Buying Shuffle Master Put
27       Options**

28           Howey also has explained in detail his thought process leading up to the purchase of his

Shuffle Master put options on February 26, 2007.  As Howey testified:

sd-562790                                          7

> I had lost, I think about 80 percent of my position and I think it was
> a pretty irrational thought that came very late in the day as I started
> looking at tomorrow and [I] realized it had gone down and down
> and down and I thought if I can't beat 'em I'll join 'em and I just
> took pretty much what was the same amount of money and said I'll
> buy puts and if it only moves like it's been moving, a little bit
> down, I'll make some money.

(Howey Test. 89:17-24.)  Howey further explained that, just as he watched the price of calls drop,

he noticed that the price of puts was increasing and "felt after being beaten down for six weeks

maybe [he] would get beaten down one more day and make [a] few dollars." (*Id.* 90:9-91:14; *see*

*also id.* 91:22-23 ("The major factor is I had lost and lost and lost and from the 21st to the 26th

the loss was accelerating").)  Moreover, Howey's *contemporaneous* trading journal, which the

SEC used in questioning Howey during testimony, states "[a]fter constant drifting down in [the]

market in general and Shuffle specifically, on the 26th or 27th decided to reverse position 100

percent, sold all calls and bought puts in the same position." (*Id.* 68:5-16.)  Howey again, in

answering the SEC's question of why he purchased puts, said: "Why do this? I – it was just

impulse, it had gone down and down and down and if [it] had just gone down a little bit more I

would be in a good place, I thought, and all I did was take the same position, approximately, and

reverse it." (*Id.* 162:16-20.)

In Opinion 5.2, Mayer again confirms Howey's observations of the market price of

Shuffle Master's securities and recites Shuffle Master's historical put and call option prices,

specifically noting the significant decline in those prices shortly before Howey's trades.  Again,

no expert testimony is needed here.  He then goes on to opine, without any analysis or

explanation, that "there is no value to this information that would lead to trading." (Marshall

Decl. ¶ 3, Ex. 2 at 15-18.)  In coming to this conclusion, which defies logic,[5] Mayer provides no

economic, scientific or any other analysis, study or explanation.  Rather, he merely comes to the

one-sentence conclusion that the information lacks trading value.  The trier of fact is capable of

determining whether there is any value in knowing that Shuffle Master's call prices were

---

[5] It defies logic and common sense to opine that, in determining whether to buy or sell securities, a recent significant change in the price and value of those same securities is of "no value" to an investor.

1

2   dropping while its put prices were increasing.  The trier of fact does not need Mayer's

3   unsupported conclusion for this analysis.  For all of the same reasons noted above, the Court

4   should exclude Mayer's opinion on this point as well.

5   **IV.     MOTION IN LIMINE NO. 3:  TO EXCLUDE MR. MAYER'S PURPORTED**
        **EXPERT OPINION REGARDING HOWEY'S TRADING STRATEGY AND**
6       **EXPERIENCE**

7           In his Opinion 5.3, Mayer opines that Howey's purchase of Shuffle Master put options on

8   February 26, 2007 was inconsistent with Howey's trading strategy and experience.  (Marshall

9   Decl. ¶ 3, Ex. 2 at 18-20.)  Opinion 5.3 is not helpful to the trier of fact as it provides no

10  "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702.  The jury does not

11  need Mayer to recite the explanations given by Howey in his investigative testimony or to chart

12  out Howey's historical stock market purchases as he does in Opinion 5.3.  Nor does the jury need

13  Mayer to opine as to Shuffle Master's historical stock and put option prices.  Howey can testify at

14  trial as to his normal trading strategy and his experience in trading in put options and the jury can

15  decide for itself whether Howey's purchase of put options on February 26, 2007 fell in line with

16  his trading strategy and experience or was extraordinary.  Opinion 5.3 does not help the jury in

17  that task and should be excluded from trial.

18  **V.      MOTION IN LIMINE NO. 4:  TO EXCLUDE MR. MAYER'S PURPORTED**
        **EXPERT OPINION ON ULTIMATE QUESTION OF LAW**
19

20          In his Opinion 5.4, Mayer purports to opine that Howey's trading "is consistent with what

21  an investor would do if they had inside information on Shuffle Master."  (Marshall Decl. ¶ 3, Ex.

22  2 at 20.)  This is nothing more than an impermissible attempt to provide an opinion on the

23  ultimate question of law — whether Howey engaged in insider trading.  In reaching Opinion 5.4,

24  which appears to be an attempt to opine on the psychological state of all investors, Mayer is

25  expressing his own views on how the law should apply to a particular set of facts.  This is a legal

26  question, not the proper subject for expert opinion.  The Ninth Circuit has held that expert

27  testimony is insufficiently helpful, and thus inadmissible, where it simply instructs the jury as to

28  what result it should reach.  *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1059-

60 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an

1

2   opinion on an ultimate issue of law") (quoting *Hangarter v. Provident Life & Accident Ins. Co.,*

3   373 F.3d 998, 1016 (9th Cir. 2004)).  Matters of law are for the court to determine, and thus

4   "inappropriate subjects for expert testimony."  *Aguilar v. Int'l Longshoremen's Union Local No.*

5   *10,* 966 F.2d 443, 447 (9th Cir. 1992) (expert testimony as to legal issues "utterly unhelpful" and

6   inadmissible); *see also Leslie,* 2010 WL 2991038, at *9 ("[T]he use of expert testimony is not

7   permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable

8   law or the role of the jury in applying that law to the facts before it") (citation omitted).

9          Moreover, even if Mayer's opinion that Howey acted the way he believes other investors

10   with inside information would act, the risk of prejudice from Mayer's "expert" opinion would

11   substantially outweigh its minimal probative value.  Fed. R. Evid. 403; *see also U.S. v. Gonzalez-*

12   *Maldonado,* 115 F.3d 9, 18 (1st Cir. 1997) ("Expert testimony on a subject that is well within the

13   bounds of a jury's ordinary experience generally has little probative value.  On the other hand, the

14   risk of unfair prejudice is real.  By appearing to put the expert's stamp of approval on the

15   government's theory, such testimony might unduly influence the jury's own assessment of the

16   inference that is being urged").  Mayer's Opinion 5.4 should be excluded from trial.

17   **VI.    MOTION IN LIMINE NO. 5:  TO EXCLUDE EVIDENCE OR ARGUMENT
         CONCERNING DUNN'S AND HOWEY'S TELEPHONE CALL SEVEN MONTHS**
18   **        AFTER THE TRADING ISSUE**

19          In September 2007, Dunn learned that the SEC was investigating Howey's (and others')

20   trading activities surrounding the time of Shuffle Master's press release on February 27, 2007.

21   Dunn telephoned Howey to let him know of the SEC's investigation.  The SEC, no doubt, will try

22   to draw the inference from this conversation that Dunn and Howey somehow knew Howey's

23   trading on February 26, 2007 was improper.  This conversation, however, has no relevance to

24   Howey's trading seven months earlier and any inference of such a connection would be

25   prejudicial to Dunn.  Fed. R. Evid. 401-403.  This after-the-fact conversation is not probative of

26   any wrongdoing.  All it shows is that Dunn told Howey that he had learned that the SEC was

27   conducting an investigation into Howey's trading.

28

sd-562790                                    10

VII.   **MOTION IN LIMINE NO. 6:  TO EXCLUDE EVIDENCE OR ARGUMENT CONCERNING PRETRIAL MOTIONS**

Dunn moves to preclude all evidence and/or argument at trial concerning any action of this Court as to any pretrial motion, including motions to dismiss, motions for summary judgment, and motions *in limine*.  Evidence or argument concerning the disposition of pretrial motions is irrelevant and the probative value is substantially outweighed by the risk of unfair prejudice.  *SEC v. Retail Pro, Inc.*, No. 08cv1620-WQH-RBB, 2011 WL 589828, at *4 (S.D. Cal. Feb. 10, 2011) (granting motion in limine and holding "evidence of, or reference to, the Court's summary judgment Order presents a substantial risk of jury confusion and unfair prejudice to the Defendant"); *Walton v. Bridgestone/Firestone, Inc.*, No. cv-05-3027-PHX-ROS, 2009 U.S. Dist. LEXIS 85014, at *26-27 (D. Ariz. Jan. 16, 2009) ("Any reference or argument to the jury concerning motions, pleadings, discovery disputes, alleged discovery misconduct or other court documents is similarly irrelevant and prejudicial and is excluded"); *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-836, 2006 U.S. Dist. LEXIS 97327, at *39 (S.D. Ohio Mar. 27, 2006) (excluding references at trial to the Court's summary judgment opinion and Order as irrelevant and "too prejudicial to introduce to the jury at trial").

The Court's rulings are not factual determinations on the merits of any claim, but dispositions of discrete legal issues based on specific motion standards.  *See, e.g., Clipco, Ltd. v. Ignite Design, LLC*, No. 04-C 5043, 2005 U.S. Dist. LEXIS 26044, at *6 (N.D. Ill. Oct. 28, 2005) ("motion in limine to exclude reference to the court's summary judgment ruling must be granted").  The fact that the Court granted or denied a pre-trial motion has no tendency to prove or disprove any *fact* of consequence to the determination of this action.  Fed. R. Evid. 401; *see e.g. Poison v. Cottrell, Inc.*, No. 04-cv-882-DRH, 2007 WL 2409838, at *2 (S.D. Ill. Aug. 23, 2007) (excluding reference to summary judgment determinations because "(t)he Court's rulings of law are clearly irrelevant to the jury's findings").  Moreover, any testimony or reference to pretrial orders would be highly prejudicial because it invites the jury to draw the unfairly prejudicial inference that the Court reached a decision on the merits of the SEC's claims.  Such a result would be improper.

1
2   **VIII.   CONCLUSION**
3           For the foregoing reasons, the Court should enter the requested Orders.
4
5   Dated: November 4, 2011                  MORRISON & FOERSTER LLP
6                                            LEWIS AND ROCA LLP
7
8                                            By:   /s/ Joice B. Bass
9                                            Co-Counsel for Defendant R. Brooke Dunn
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on November 4, 2011, the foregoing document was electronically filed with and is available for downloading from the CM/ECF system:

Nancy J. Gegenheimer - *gegenheimern@sec.gov*

Spencer H. Gunnerson -*s.gunnerson@kempjones.com*

Mark M. Jones - *m.jones@kempjones.com*

Treasure R. Johnson - *tjohnson@venable.com*

/s/ Judith A. Vienneau
An Employee of Lewis and Roca LLP

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada 89169

604195.1